This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**CARL UNDERWOOD, Personal Representative**
**of the Estate of Earl Lee Anders,**

Appellant-Petitioner,

v.                                              NO.  30,751

**NEW MEXICO COMMISSIONER OF**
**PUBLIC LANDS, PATRICK LYONS,**

Appellee-Respondent.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Sarah M. Singleton, District Judge**

Domenici Law Firm
Pete V. Domenici, Jr.
Lorraine Hollingsworth
Albuquerque, NM

for Appellant

New Mexico State Land Office
John L. Sullivan, Associate Counsel
Santa Fe, NM

for Appellee

# MEMORANDUM OPINION

**BUSTAMANTE, Judge.**

This case calls us to explore the outer boundaries of the Land Commissioner's discretion when reviewing a hearing officer's ruling as to the value of improvements on public lands. Appellant, on behalf of the owner of the improvements, contends that the Land Commissioner is constrained to accept the hearing officer's findings of fact to the extent they are supported by substantial evidence. The Land Commissioner asserts that he is free to reject the hearing officer's decision and reach his own conclusion as to value based on any evidence adduced at the hearing. We conclude that the Land Commissioner is not bound by the hearing officer's findings of fact. We also conclude that the Land Commissioner's decision here is supported by substantial evidence. We thus affirm.

## FACTS AND PROCEEDINGS

Mrs. Earl Lee Anders leased property from the State Land Office for a number of years under Business Lease No. BL-882.[1] The property consists of three separate parcels of land referred to by the parties as the "north side," the "community center," and the "south side" parcels.

---

[1] Appellant Carl Underwood is the personal representative of the Estate of Mrs. Anders and acted on her behalf throughout the proceedings. Unless context requires otherwise, we refer to them throughout as "Lessee."

In September 2005 the Lessee informed the Land Commissioner that he would be terminating the lease effective December 31, 2005, and that pursuant to paragraph six of the lease, he expected "compensation for the improvements on the property, pursuant to NMSA 1978, Section 19-7-14 [(1963)]." Paragraph six of the lease provides in pertinent part:

> Lessee shall, pursuant to [Section] 19-7-14, be compensated for improvements upon termination of this [l]ease, with such improvements valued at *market value* which is defined as: the most probable price in cash that the improvements would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all the uses and purposes to which the improvements as well as the property on which they are located are adapted and for which they are capable of being used.

Lessee submitted an appraisal prepared by Gareth Burman and Dana Trump (Burman/Trump appraisal), which placed a value on the improvements, based on an income approach, of $630,000 as of August 13, 2005. The Land Commissioner requested John Howden to prepare an appraisal of the property for him. Howden's appraisal resulted in a "residual value, as of June 6, 2006, of $10,000." Burman, Trump, and Howden were each certified appraisers.

The record before us reveals two formal responses to what we surmise were demands by Lessee that the Land Commissioner accept the $630,000 valuation as accurate. In April 2006, counsel for the Land Commissioner acknowledged receipt of Mr. Burman's appraisal, posed a number of questions concerning its approach and

assumptions, and requested a response from Mr. Burman. The record does not contain anything purporting to be a response to this request. On July 20, 2006, the Land Commissioner—again through counsel—provided his decision as to the value of the improvements. Asserting that the Burman/Trump appraisal made a number of mistakes and incorrect assumptions, the Land Commissioner "determined that the improvements on the north side and community center [parcels] have no contributory value to the property and that the improvements on the larger south side [parcel] have a value of $10,000, as indicated in Mr. Howden's appraisal."

Lessee filed a petition for contest with the State Land Office on August 17, 2006, requesting relief for the market value of the improvements in accordance with the Burman/Trump appraisal. On August 25, 2006, former district judge and Court of Appeals Judge Thomas A. Donnelly was appointed by the Land Commissioner to serve as the Hearing Officer for the contest. The State Land Office (SLO) filed its position statement in response to the petition for contest and requested that the Hearing Officer "find that the improvements on the large south side [parcel] are worth $10,000 and the 'improvements' on the small south side [community parcel] and north side [parcel] are worthless because they are functionally obsolete." During the hearing on the merits, the Lessee chose to "voluntarily dismiss with prejudice any and all legal claims he had or may have for compensation for the improvements on the

3

"[n]orth side and [c]ommunity [c]enter [parcels]," leaving at issue only the south side parcel.

At the hearing, Lessee presented the testimony of Mr. Burman and Mr. Donnell, certified real estate appraisers. The SLO offered the testimony of John Howden and Bryan Godfrey, also certified appraisers. Mr. Howden initially testified in accordance with his written appraisal, but during cross-examination changed his mind and arrived at a value of $285,000. The SLO also presented the testimony of two lay witnesses—John Daugherty and Ted Garcia—concerning the value of the improvements. John Daugherty owns several mobile home parks—including a park abutting the subject property—and was at one time interested in purchasing the property. After describing the obsolescent condition of the improvements, he testified that he believed the improvements had no value. Ted Garcia held a development lease from the SLO on the subject property at the time of the hearing and also testified that the improvements were not worth $10,000 to him. The SLO also presented the testimony of a City of Albuquerque electrical inspector and electrical contractor to describe the condition of the electrical system on the property and the potential cost of repair. The gist of the testimony was that the electrical system had been red-tagged and repairs would likely cost over $100,000. In addition, it is undisputed that the

4

natural gas service to the south side parcel had failed before Lessee surrendered the property. Mr. Burman's estimate for repair of the gas system was right at $100,000.

The Hearing Officer made a finding of fact that:

> Mr. Burman, Mr. Donnell, and Mr. Howden, all testified that the appropriate methodology for determining the value of Petitioner's improvements on the South[side] Parcel No. BL-882, is to apply the lease language, determine the value of the entire parcel, and then subtract the raw land value. The remaining value would then indicate improvement value.

And the Hearing Officer concluded as a matter of law that each of the appraisers "conducted their appraisals of the improvements . . . utilizing well recognized principles and practices normally used in their profession to determine the fair market value of improvements on real property, including improvements located on [S]tate lease lands." The Hearing Officer recommended that the improvements be valued at $285,000—the low end of the range of values provided during the hearing and the value given by Mr. Howden during cross-examination.

The SLO filed a motion for reconsideration arguing that the Hearing Officer had made a mistake in relying on Mr. Howden's testimony at trial because he had clearly been "misled" during his cross-examination. The SLO attached an affidavit from Mr. Howden explaining why he became confused during his testimony and renewing his adherence to his original $10,000 valuation. The SLO requested in the

5

alternative that the hearing be reopened. The Hearing Officer denied the SLO's motion and struck Mr. Howden's affidavit on October 26, 2007.

In June 2008 the Land Commissioner filed his "Final Decision"—a twenty-six page detailed review of the evidentiary record and the Hearing Officer's recommended determination. The Land Commissioner rejected the opinion testimony of all of the certified appraisers presented at the hearing and as a result rejected the Hearing Officer's recommendation as to value. Instead, the Land Commissioner undertook his own review of the evidence and came to the conclusion that the improvements "have no market value."

Lessee timely filed a notice of appeal in the district court. The district court affirmed, concluding that the Land Commissioner could lawfully reject the certified appraisers' opinions and rely on lay testimony for his ultimate decision. We affirm, though on a different rationale.

**ANALYSIS**

Lessee makes three basic arguments. First, he asserts that the Land Commissioner acted outside the scope of his authority when he rejected the Hearing Officer's report and then conducted his own review of the hearing record. In Lessee's view, the Hearing Officer was the fact finder and the Land Commissioner was required to accept the Hearing Officer's findings of fact if they were supported by

substantial evidence. Second, he asserts that Section 19-7-14 requires that all property valuations conducted by the SLO must be based on certified appraisals, and thus the Land Commissioner could not legally rely on lay testimony for his valuation decision. Third, Lessee asserts that the Land Commissioner violated his due process rights because he did not act as a neutral and unbiased decision maker.

**1.     STANDARD OF REVIEW**

Under NMSA 1978, §§ 19-7-17 and 19-7-67 (1999), the appeal from the Land Commissioner's decision is governed by NMSA 1978, § 39-3-1.1(D) (1999), which provides that a court may set aside, reverse or remand an agency's final decision if the court determines that:

> (1)     the agency acted fraudulently, arbitrarily or capriciously;

> (2)     the final decision was not supported by substantial evidence; or

> (3)     the agency did not act in accordance with law.

On certiorari from a district court appeal from an agency administrative proceeding, the Court of Appeals applies the same appellate standard of review as the district court. *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 16, 133 N.M. 97, 61 P.3d 806. Under Rule 1-074(R) NMRA, the district court may also reverse an agency decision if the agency action was outside the scope of the authority of the agency. *See Paule v. Santa Fe Cnty. Bd. of Cnty. Comm'rs*, 2005-

NMSC-021, ¶ 26, 138 N.M. 82, 117 P.3d 240 (discussing standard of review under Section 39-3-1.1 and Rule 1-074).

**2.      The Land Commissioner Did Not Exceed His Authority**

Lessee's right to payment for the improvements on the property derives from Section 19-7-14 which provides in pertinent part:

> Whenever any state lands are sold or leased to a person other than the holder of an existing surface lease and upon which lands there are improvements belonging to such lessee or to another person, the purchaser or subsequent lessee, as the case may be, shall pay to the commissioner of public lands for the benefit of the owner of the improvements the value thereof as determined by an appraisal made by the commissioner of public lands.

As described above, Lessee and the Land Commissioner could not agree to a value and Lessee initiated a contest proceeding pursuant to NMSA 1978, Section 19-7-64 (1912), which states:

> Any person, association of persons or corporation claiming any right, title, interest or priority of claim, in or to any state lands, covered by any lease, contract, grant or any other instrument executed by the commissioner, shall have the right to initiate a contest *before the commissioner* who shall have the power to hear and determine same. The commissioner shall prescribe appropriate rules and regulations to govern the practice and procedure of such contests.

(Emphasis added.)

The Land Commissioner has adopted regulations prescribing the contest process. *See* 19.2.15.9 NMAC (6/30/04). Regulation 19.2.15.6 of the Administrative

8

Code states that the objective of the regulation is to "provide a clear, mandatory, administrative remedy for persons aggrieved by an agency determination." Subsection F of Regulation 19.2.15.7 of the Administrative Code defines "Hearing Officer" as "the person appointed by the commissioner to conduct the contest." Subsection B of Regulation 19.2.15.11 of the Administrative Code of SLO's regulations provides that:

> The commissioner's appointment of a hearing officer shall constitute a delegation of the commissioner's statutory powers under [NMSA 1978] Section 19-7-65 [(1953)] and of the commissioner's constitutional and inherent power to control the conduct of administrative proceedings under the commissioner's jurisdiction.

The Hearing Officer here was appointed "to take testimony, receive documentary evidence, and make a report to [the Land Commissioner], including proposed findings of fact, conclusions of law and recommended action."

Subsection E of Regulation 19.2.15.17 of the Administrative Code provides that:

> Upon receipt of the hearing officer's final report, the commissioner shall, within a reasonable time, issue an order adopting, modifying, or rejecting that report. This order shall be the decision of the commissioner, and as such, it shall contain a grant or denial of the relief requested and a statement of the legal and factual basis for the order.

Lessee argues that in this schema the Hearing Officer is the fact finder and that the Land Commissioner must review the Hearing Officer's findings deferentially; that

9

is, the Land Commissioner must employ a substantial evidence standard of review and he is bound by all findings which are supported by substantial evidence. Lessee faults the Land Commissioner for erroneously conducting a "de novo" review, reweighing the evidence and coming to his own conclusion. Lessee argues that the portion of 19.2.15.17(E) NMAC allowing the Land Commissioner to modify or reject the Hearing Officer's report does not provide any authority for the Land Commissioner to assess the hearing record and come to his own conclusion. We disagree.

Lessee relies almost entirely on *In re Bristol*, 2006-NMSC-041, 140 N.M. 317, 142 P.3d 905, to support his argument. In *Bristol*, the Supreme Court considered the process to be followed in attorney disciplinary matters under its Rules Governing Discipline. *Id.* ¶ 2. The Disciplinary Rules contemplate the appointment of a hearing committee whose job it is to take testimony and issue "findings of fact, conclusions and recommendations for discipline" which are then submitted to the Disciplinary Board. *Id.* The Disciplinary Board then appoints a hearing panel to review the hearing committee's recommendations. *Id.* ¶ 3. The hearing panel can "accept, reject or modify or increase the sanctions contained in the recommendations of the hearing committee." *Id.* (internal quotation marks and citation omitted). In addition, the hearing panel is not restricted to the findings of the hearing committee and "may render its decision based upon the record and any additional findings that it may

make." *Id.* (internal quotation marks and citation omitted). The hearing panel files its report with the Supreme Court. *Id.*

In *Bristol*, the hearing committee and the hearing panel disagreed on the basic nature of the attorney's conduct. The hearing committee concluded his actions were the result of mistake and negligence rather than dishonesty, fraud, or deceit. *Id.* ¶ 11. The hearing panel, in contrast, concluded that the attorney's conduct did involve dishonesty, fraud, deceit, or misrepresentation. *Id.* ¶ 12.

The Supreme Court rejected the hearing panel's recommendation, concluding that it had "overstepped its role as the administrative reviewer of the hearing committee's factual findings." *Id.* ¶ 14. The Supreme Court concluded that hearing committees should be viewed as "any other fact finder that should be given deference on questions of fact." *Id.* ¶ 16. As such, the Supreme Court held that henceforth hearing panels should "defer to the hearing committee on matters of weight and credibility, viewing the evidence in the light most favorable to the hearing committee's decision and resolving all conflicts and reasonable inferences in favor of the decision reached by the hearing committee." *Id.*

Granting the superficial similarities between *Bristol* and this case, we conclude that *Bristol* does not apply here. *Bristol* involved a "rule-driven disciplinary process that differed in key respects from the process set forth in" the Land Commissioner's

11

regulations and the statutory provisions which underlie the content proceeding at issue here. *Skowronski v. N.M. Pub. Educ. Dep't*, 2012 -NMCA-___, ¶¶ 27, 31-32, ___ P.3d ___ (No. 31,119, Nov. 8, 2012) (holding that the Secretary of Education retained the power to reject proposed findings of fact from a hearing officer and make her own findings). In *Bristol*, the Supreme Court was interpreting and applying a set of rules it promulgated. The Supreme Court was thus free to interpret them as it pleased—within constitutional limits, of course. In deciding *Bristol*, the Supreme Court did not indicate that it was formulating an approach which it intended should be applied in other contexts. It did not cite any cases dealing with the same issue in other administrative contexts. And it did not cite to or discuss any other statutory or regulatory frameworks, whether within the judiciary or the executive departments. Nor would we expect the Court to do so given the context in which *Bristol* arose.

This case presents a wholly different context. Here we consider a decision by a constitutionally created executive officer exercising power as defined in statutory provisions adopted by the Legislature and in regulations promulgated by the officer. The applicable statute charges the Land Commissioner with the duty to set the value of improvements left on state land at the end of a lease. Section 19-7-14. Disagreements with the Land Commissioner's decisions are decided by contest proceedings "before the commissioner who shall have the power to hear and

12

determine the same" under regulations prescribed by the Commissioner. Section 19-7-64. Despite the Land Commissioner's appointment of a hearing officer to conduct the contest pursuant to 19.2.15.17(F) NMAC, the regulations provide no hint that the Land Commissioner intends to cede his power or responsibility as the final decision maker to anyone. *See* 19.2.15.2 NMAC (providing that "[t]his part does not enlarge, diminish or in any way alter the constitutional and statutory jurisdiction of the commissioner of public lands or the substantive rights of any person."

Under the regulations a hearing officer conducts the contest. *See* 19.2.15.7(F) NMAC. The Commissioner's appointment of a hearing officer constitutes "a delegation of the commissioner's statutory powers under [NMSA 1978,] Section 19-7-65." 19.2.15.11(B) NMAC. The regulations—apparently by design—do not delegate the commissioner's power under Section 19-7-64 to finally determine contests. Under the regulations the hearing officer prepares and submits a "final report" which the Land Commissioner can adopt, modify, or reject. 19.2.15.17(D) and (E) NMAC. As in *Skowronski*, 2012-NMCA-___ ¶ 28, the hearing officer here was charged with the duty to make a report "including proposed findings of fact, conclusions of law and recommended action."

The statutory and regulatory framework at work in this case make the Land Commissioner the final decision maker in the process. As such he is not bound by the

proposed findings of the hearing officers appointed by him. The Land Commissioner can review the record anew and modify or reject the Hearing Officer's recommendations. The ability to do so is an inherent part of his position and power.

That power is, however, not without limitations. Case law is clear that a decision maker in the Land Commissioner's position must demonstrate that he reviewed the transcript of the hearing and examined the documentary evidence to the extent necessary to provide him an informed basis on which to act. *See Skowronski*, 2012-NMCA-___, ¶¶ 29-31; *Bd. of Educ. of Melrose Mun. Sch. v. N.M. State Bd. of Educ.*, 106 N.M. 129, 130, 740 P.2d 123, 125 (Ct. App. 1987) (holding that as the final arbiter the State Board of Education could reverse a decision of a hearing officer even on points turning on credibility so long as the Board reviews the transcript of the hearing); *Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1 v. Jennings*, 98 N.M. 602, 604, 651 P.2d 1037, 1039 (Ct. App. 1982).

Lessee does not argue that the Land Commissioner did not sufficiently review the transcript and exhibits. If anything, Lessee's argument is that the Land Commissioner reviewed the hearing too closely. In any event, it is evident from the Land Commissioner's twenty-six page decision that he reviewed the hearing in detail. All that remains is to review whether the Land Commissioner's decision is supported by substantial evidence in the record. We turn to that issue now.

14

**3.     The Land Commissioner's Decision is Supported by the Record**

Lessee argues that the Land Commissioner improperly rejected the opinions of the expert appraisers and then improperly relied solely on lay testimony for his decision. This latter contention rests on Lessee's assertion that under Section 19-7-14, all valuations done by the Land Commissioner must be based on appraisals performed by certified appraisers. The meaning of the word "appraisal" in Section 19-7-14 presents a thorny problem, but one which we need not resolve here because we conclude that the Land Commissioner rejected the appraisers' opinions on reasonable grounds and that he did not base his final decision solely on lay testimony.

Acting as a fact finder, the Land Commissioner had the duty to evaluate and weigh the testimony presented and the discretion to reject testimony he reasonably found wanting, including expert opinion testimony. *Sanchez v. Molycorp, Inc.*, 103 N.M. 148, 153, 703 P.2d 925, 930 (Ct. App. 1985); *see also* UJI 13-213 NMRA (allowing juries to "reject an opinion entirely if you conclude that it is unsound"). The Land Commissioner evaluated the testimony and opinions of the appraisers in detail, and he provided a reasonable rationale for his decision to reject them all. For example, the Land Commissioner rejected Lessee's primary expert—Mr. Burman—because:

15

(1)     he failed to consider whether a "knowledgeable buyer" would be willing to pay for the improvements given the limits on the use of the land given its status as state property;

(2)     he assumed an unreasonable absorption of new tenants at a rate of five per month;

(3)     he failed to account for financial incentives to move in;

(4)     he assumed that the infrastructure was functional without actually inspecting it;

(5)     he failed to account for the potential that the infrastructure required substantial repairs to basic systems such as the natural gas and electrical systems and the repairs could require closing the park for an extended time;

(6)     he assumed a monthly rental of $410/month to $385/month when neighboring parks were charging $300 to $325 per month.

The Land Commissioner relied on testimony presented at the hearing to support his rejection of Mr. Burman's appraisal. Lessee does not question that the testimony relied on by the Land Commissioner is in the record, but insists instead that reliance on it was improper.

The Land Commissioner rejected Mr. Donnell's opinion on two grounds. First, his opinion relied entirely on Mr. Burman's work and assumptions and thus was affected by the same limitations. Second, Mr. Donnell's value was for all "three parcels and cannot be divided among the individual parcels" and he never offered an opinion for the south side parcel alone.

16

The Land Commissioner reviewed the Hearing Officer's recommended values as based entirely on Mr. Howden's opinion. The Land Commissioner rejected the $285,000 opinion Mr. Howden gave at the hearing during cross-examination as simply "erroneous." The Land Commissioner reviewed Mr. Howden's written appraisal report and determined from its face that the term "Additional Income" was an annual figure which included miscellaneous sources such as washing machines, late charges, and forfeited deposits. Thus, he rejected Mr. Howden's testimony at the hearing that the figure was for "gas" and was a monthly figure which should be multiplied by twelve. This conclusion is bolstered by the fact that the south side parcel did not have gas service at any time pertinent to the appraisal. The Land Commissioner's rejection of Mr. Howden's in-hearing testimony left his written estimate of $10,000 in place. The Land Commissioner also noted that Mr. Howden "never accounted for the $132,000 cost of repairing the park's electrical system in his opinion of the value of the improvements."

Finally, the Land Commissioner found as a matter of fact that "[w]ithin the next five years, the highest and best use of the land underneath the [park] will not be as a mobile home park and the land should not be leased out for a long term lease for the running of a mobile home park." The Land Commissioner then found that "Mr. Howden testified that it would be unreasonable for anyone to invest over $232,000 to

repair the gas lines and electrical system at the park when the park's economic life is around five years."

We see no basis to conclude that the Land Commissioner's assessment of the testimony at the hearing is so wrong that it cannot stand as substantial evidence supporting his decision. The Land Commissioner did note that the lay witnesses ascribed no or little value to the property. But we cannot conclude that those statements formed the sole basis for his decision. Assuming without deciding that the Land Commissioner's decision was required to be based on a certified appraisal, the portion of Mr. Howden's testimony that the Land Commissioner accepted is sufficient to support his decision. This is not an instance where an agency's decision failed to address the evidence presented at the testimonial stage of a proceeding. *See Atlixco Coal. v. Maggiore*, 1998-NMCA-134, ¶¶ 24-26, 125 N.M. 786, 965 P.2d 370. Nor is this an instance in which an agency action is the result of an unconsidered choice. *See Bass Enters. Prod. v. Mosaic Potash Carlsbad Inc.*, 2010-NMCA-065, ¶ 45, 148 N.M. 516, 238 P.2d 885. Again, if anything Lessee's complaint is that the Land Commissioner considered and weighed too much of the evidence from the hearing.

**4.     There was no Due Process Violation**

Lessee asserts that the Land Commissioner did not act as a neutral and unbiased decision maker because he improperly sought to have the Hearing Officer consider

18

new evidence in the form of Mr. Howden's post-hearing affidavit in support of rehearing and, failing that, created the evidence during his own review. Lessee also argues that it was improper to have the same attorney represent the SLO in the contest hearing and the Land Commissioner during the appeal to district court. We review the issue de novo. *Bass Enters. Prod.*, 2010-NMCA-065, ¶ 49.

The Land Commissioner argues essentially that so long as he acted within his statutory mandated role he cannot be found to have violated Lessee's due process rights—at least in the absence of some sort of personal bias against Lessee. Noting that procedural due process is a flexible, fact-dependent concept, we agree. *See id.* ¶ 51. We have already held that under the statutory and regulatory provisions controlling his actions, the Land Commissioner is the ultimate fact finder in these proceedings. We have also found that the Land Commissioner's decision is reasonable and supported by the evidence in the record. We disagree that the Land Commissioner created or introduced any new evidence in the record. To find a violation of due process in this circumstance we would have to find the statutory and regulatory scheme unconstitutional. Given that the dispute resolution framework we have here is similar to other executive agency formats we have previously approved of, we see no basis to find a due process violation.

We also note that Lessee does not argue that the Land Commissioner held any personal animus against him. *Cf. Phelps Dodge Tyrone, Inc. v. N.M. Water Quality Control Comm'n*, 2006-NMCA-115, ¶¶ 41-42, 140 N.M. 464, 143 P.3d 502 (rejecting due process challenge as to alleged bias of Water Quality Control Commission member, and noting that statutory composition of the Commission contemplates members "who have been politically and publicly active, people from industry, and people who have expressed their views and who have been engaged in the regulatory process. It is unrealistic to expect that the public members will be people who have not taken positions, or people who come with a clean slate" (internal quotation marks and citation omitted)).

**III.    CONCLUSION**

We affirm.

**IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Judge**

_____

**J. MILES HANISEE, Judge**